[Civil No. 4019. Filed November 7, 1938.]

[83 Pac. (2d) 997.]

NORMAN COLE, Petitioner, v. TOWN OF MIAMI, Defendant-Employer; THE INDUSTRIAL COMMISSION OF ARIZONA, J. NEY MILES, L. C. HOLMES and SAM PROCTOR, Members of said Industrial Commission of Arizona, Respondents.

Mr. H. S. McCluskey, for Petitioner.

Mr. Don C. Babbitt and Mr. Howard A. Twitty, for Respondents.

LOCKWOOD, J.—Norman Cole, hereinafter called petitioner, has brought before us for review an award of the Industrial Commission, hereinafter called the commission, made on April 25, 1938, the material part of which reads as follows:

"6. That the evidence is insufficient to establish that there is at this time any increase in the disabilities found by this Commission in its findings and award dated the 28th day of October, 1935, or that the alleged

new and heretofore unknown disabilities now by this applicant complained of are proximately the result of the injury by him sustained on the 16th day of January, 1934.

"Award.

"Now therefore, it is ordered that the applicant take nothing further from the defendants, or either of them, by reason of said claim."

Petitioner assigns two grounds why we should reverse the award: (a) That the commission was guilty of at least constructive fraud in a previous award made October 28, 1935, in that it failed to notify him at that time as to his true condition and its prognosis, and (b) that the evidence does not sustain the award. The situation out of which the appeal arose is not in dispute, and may be stated as follows:

Petitioner for a period of some fifteen years prior to January 16, 1934, had been employed as a motorcycle police officer by the town of Miami. On or about that date he sustained an injury arising out of and in the course of his employment, when the motorcycle he was riding skidded, throwing him over the handle bars onto some rocks. His attending physician discharged him for work on February 14, 1934. After resuming his employment he had another compensable injury on March 18, 1934, when he was hit by an automobile and thrown in the air, striking his head behind the right ear when he fell. He received certain medical treatment and the commission gave him a total temporary disability rating from March 18, 1934, up to October 28, 1935, a period of over a year and a half. On the date last mentioned the commission made a finding and award which, so far as material, reads as follows:

"2. Said injury caused also permanent partial disability equal to 25% of a total general permanent disability entitling said applicant to compensation therefor in the sum of $22.00 monthly until further order of the Commission.

"Award.

"Award is hereby made payable to said applicant by above named defendant insurance carrier as follows:

"1. The sum of $53.11 payable forthwith.

"2. The additional sum of $22.00 monthly, until further order of the Commission, the first payment to be made on November 24, 1935."

This award was accepted without objection by petitioner until after the time for rehearing and review had expired. On December 17, 1935, he requested the commission to commute the award of October 28th into a lump sum, which request was granted, and he received in full settlement and discharge thereof the sum of $1,222, which it is admitted was the correct commuted value of the award. On December 9, 1937, almost two years thereafter, petitioner applied for a reinstatement of his case as of October 28, 1935, on the theory that at the time of that award he was actually totally disabled, but that the commission had fraudulently concealed the true extent of his injury as an inducement for him to accept the award without question. He further alleged a total disability due to Jacksonian epilepsy, which he claimed was caused by the two accidents of January 16 and March 18, 1934.

The commission refused to set aside the award of October 28, 1935, and to reinstate the case as of that date, but agreed to consider it as an application for rearrangement of compensation, under section 1447, Revised Code 1928. The medical rating board, which had previously examined petitioner and had made the report upon which the award of October 28, 1935, was made, reviewed the history of the case, including the claims made by petitioner as to the existence of Jacksonian epilepsy, but made no physical examination of him, recommending that a thorough examination be made by a competent neurologist under

hospital observation, and that if the neurologist thought best, he should make such special examinations as might be deemed advisable, including an encephalogram, and requested that these examinations be made by Dr. John Louis Saxe, of Phoenix, who was a specialist in neurology. The patient was kept in the hospital under observation for a period of some three or four days, whereupon Dr. Saxe suggested to him, his wife, and his attorney that it was advisable that a spinal Wasserman be made for the purpose of ascertaining whether patient was suffering from neuro-syphilis, and also an encephalogram. There is some dispute as to whether Dr. Saxe explained at that time to the petitioner and his attorney the purpose of the encephalogram, but it is not disputed that petitioner's wife did protest against a spinal puncture of any nature at the time petitioner was in the hospital, and that his attorney both then and at the hearing positively refused to consent to the making of an encephalogram. The matter came on for hearing and Dr. John J. Walsh, who had attended petitioner during three convulsive seizures which were the basis of his claim of Jacksonian epilepsy, and Dr. Henry G. Williams, who had not seen any of the seizures but had examined him the day before the hearing, testified on his behalf. They agreed that the objective symptoms might be produced by any one of a number of different causes, the three most probable being a contraction of scar tissue resulting from the accidents of January 16 and March 18, 1934, neuro-syphilis, and a tumor of the brain, and said that the best tests of determining whether either of the latter two causes existed were an examination of the spinal fluid for neuro-syphilis, and an encephalogram to determine the presence or absence of a brain tumor. They also agreed that a spinal puncture for neuro-syphilis diag-

nosis was practically without risk, but that there was a certain amount of danger in making an encephalogram, and therefore advised against it, though they did not consider the danger so great as to state it would be improper medical practice to make one. On the whole case, they were decidedly of the opinion that the convulsive seizures were due to scar tissue as a result of the accidents, though they by no means excluded neuro-syphilis or brain tumor as possible causes. Neither Dr. Williams nor Dr. Walsh was willing to qualify as specialists in neurology. Dr. Saxe agreed with Doctors Williams and Walsh in practically everything they said, except he was inclined to minimize the danger of an encephalogram and thought it should be made, and was of the opinion, in view of the refusal of the patient and his advisers to permit a spinal Wasserman or encephalogram, that a positive diagnosis of the cause of the convulsive seizures could not be made. Petitioner's counsel at the hearing then offered to have him submit to a spinal Wasserman, but positively refused to consider an encephalogram. On the basis of this evidence, the award was made.

We consider first petitioner's claim for reinstatement of the case of October 28, 1935. He contends that the commission, by its rules, has provided that applicants for compensation who are working for municipalities, such as the town of Miami, must be treated only by the physicians selected by the commission and, therefore, both the commission and the physicians selected by it occupied a fiduciary relation towards petitioner, so that they were under the duty of disclosing fully and freely to him all of the facts pertinent to his case, and that a failure to do so is at least constructive fraud, for which an award may be set aside and the case heard *ab initio,* if it appears that the petitioner was entitled to greater compensation than that which he actually received.

 We are of the opinion that, stated as an abstract proposition, the commission does not occupy the position of an adversary towards a claimant of compensation, dealing with him at arm's length, but that it sits as a judicial body to do justice according to law. *Doby* v. *Miami Trust Co.*, 39 Ariz. 228, 5 Pac. (2d) 187. This being the case, we think it follows that the commission owes to every applicant for compensation the duty of fully advising him as to all of the real facts which bear upon his condition and his right to compensation, so far as it may know them, before an award is made final, and that a deliberate attempt to conceal such facts from the petitioner would be as reprehensible as a deliberate concealment from a litigant by a court of matters material to the case which was pending before it. Further, if the commission requires a petitioner for compensation to deal only with a physician selected or approved by it, we think such physician is under the same duty towards the applicant as a private physician selected by him so far as a disclosure of his real condition is concerned, and that if the physician fails to properly perform such duty, the knowledge of the physician is imputed to the commission, and it would be constructive fraud to such an extent as to render an award, which prejudiced the rights of a petitioner, subject to be set aside in the same manner as the judgment of a court.

 But does this condition obtain in the present case? Fraud, of course, is never presumed but must be shown by clear and convincing testimony. *Schwalbach* v. *Jones*, 27 Ariz. 260, 232 Pac. 558. We have examined the record carefully, and particularly the various reports made to the commission, before the request for readjustment of compensation, by the physicians who, from time to time, treated the petitioner, and there is not a suggestion therein that there was a probability, or even a possibility, of Jacksonian

epilepsy resulting from his injury. The commission is composed of laymen, and under such circumstances there certainly can be no claim that they were guilty of actual fraud. We consider then the conduct of the physicians who treated him. The duty of a physician to his patient is to exercise his best skill and judgment in treatment, and the test is, did he possess the same skill and learning which is possessed by other members of the medical profession in good standing, and did he apply that skill and learning with ordinary and reasonable care. *Butler* v. *Rule,* 29 Ariz. 405, 242 Pac. 436. There is nothing in the record to show that the physicians who attended petitioner at the request of the commission did not possess reasonable skill and learning, or that they did not apply it with reasonable and ordinary care, or, to be specific, that the exercise of such skill and learning would have discovered the probability of the accidents causing Jacksonian epilepsy and required the communication of such knowledge to the petitioner. The burden of proving fraud was upon the petitioner. *Northwestern Nat. Ins. Co.* v. *Chambers,* 24 Ariz. 86, 206 Pac. 1081. We are of the opinion that he has failed entirely to sustain such burden. Further than that, it does not appear that the petitioner was injured, even if the commission knew and should have disclosed to him the possibility that his injuries might eventually result in Jacksonian epilepsy. At the time the award of October 28, 1935, was made, there is no contention that epilepsy had appeared. Under section 1447, *supra,* at any time that it did appear, petitioner might have made a claim for readjustment of compensation, and if he proved his case, it would have been granted. As soon as he did make such application, the commission announced that it would hear him, and if he showed an increased disability, he would be given an additional award therefor. We think the petitioner has wholly failed to bring

himself within the rule set forth above, and that the commission properly refused to reopen the case as of October 28, 1935.

 We consider next whether the award denying any readjustment of compensation is sustained by the evidence. We have held, in line with all the authorities upon the subject, that the burden of proof is upon an applicant for compensation to show affirmatively by a reasonable preponderance of the evidence that he is entitled to such compensation, and the commission is not required to disprove his contention. *Bochat* v. *Prescott Lumber Co.,* 51 Ariz. 97, 74 Pac. (2d) 575. In logic, this same rule should apply, and we think it does apply, to applicants for a readjustment of compensation. In the present case, therefore, it was incumbent upon the petitioner to show affirmatively and by a preponderance of the evidence that the convulsive condition, to which he is now apparently subject, was caused by his previous compensable accidents. By preponderance of the evidence is meant such proof as satisfies the conscience and carries conviction to an intelligent mind. *North Chicago St. R. Co.* v. *Fitzgibbons,* 180 Ill. 466, 54 N. E. 483. It does not necessarily depend upon the number of witnesses. The capacity of the submitted testimony to enforce belief upon the arbiters of fact to whom it is submitted is the touchstone of preponderance as applied to the testimony of witnesses. *McKee* v. *Verdin,* 96 Mo. App. 268, 70 S. W. 154. In other words, the ultimate test is, does the evidence convince the trier of fact that one theory of the case is more probable than the other. In cases of this nature, the commission is the trier of fact, and, as we have repeatedly said, unless its conclusion is arbitrary and cannot be supported on any reasonable theory of the evidence, we are bound thereby, even if we, sitting as triers of fact, would reach a different conclusion on the evidence.

■ Analyzing all of the evidence in the present case, we find that the expert witnesses, upon whose testimony the case must turn, all agree that there are many possible causes for the condition in which petitioner finds himself. They also agree that there are certain methods of eliminating many of these causes. There is apparently no dispute that the most probable causes are scar tissue, neuro-syphilis or brain tumor, and as far as the last two are concerned, that there are diagnostic tests well known to medical science which, if properly administered, would determine to a great degree of certainty whether either of these two causes exist. The medical rating board recommended that these tests be made, and an effort was made by the commission to have them made by a man who is admittedly an expert in this line. The petitioner, acting under the advice of his wife and attorney, positively refused to permit the tests to be made when he was under observation, and although at the time of the hearing he did consent to one of them, he refused emphatically to consent to the other. Section 1444, Revised Code 1928, read as follows:

"*Medical examinations; refusal to submit to treatment; false representations; penalty.* A workman entitled to compensation shall submit himself for medical examination from time to time at a place reasonably convenient for the workman, if, and when requested by the commission. The request shall fix a time and place, having regard to the convenience of the employee, his physical condition and ability to attend. The employee may have a physician, provided and paid for by himself, present at such examination. If the employee refuses to submit to any such examination, or obstructs the same, his right to compensation shall be suspended until such examination has taken place, and no compensation shall be payable during or for such period. A physician who makes or is present at such examination may be required to testify as to the result thereof. The commission may reduce or sus-

pend the compensation of an employee who persists in unsanitary or injurious practices tending to imperil or retard his recovery, or who refuses to submit to such medical or surgical treatment as is reasonably essential to promote his recovery.''

Under its terms, if any petitioner for compensation refuses to submit himself for medical examination at the request of the commission, his right to compensation, if any, is suspended during such period. This provision is but just, for it could easily give rise to all manner of false claims if a petitioner could refuse to allow such examinations. But while the statute does not expressly so provide, we think that there is a limit beyond which the commission may not require an examination to go. If it be apparent that it will greatly endanger the life or health of the claimant, without any reasonable prospect of securing information material to his claim, it would be arbitrary and unjust for the commission to require it, and the claimant would be under no obligation to submit thereto. The question then is, who should have the ultimate right to determine the necessity and the scope of the examination, the claimant or the commission. Plausible arguments can be made on both sides of the question. On the one hand, it may be said that a man should not be compelled to risk his life in order to obtain what is justly due him. On the other hand, it may with equal cogency be urged that the determination of whether anything is justly due the claimant is dependent upon his condition, and that if he is not willing to have the examination necessary to ascertain that condition to be made, he cannot reasonably claim compensation for something whose existence is uncertain, and the determination of which is prevented by his own act.

After careful consideration, we are of the opinion that since it is incumbent upon a claimant to

prove affirmatively that he is entitled to compensation, if he declines to allow an examination, which has been requested by the commission, to be made, he cannot claim the benefit of the statute, unless it clearly appears the examination, under all the circumstances, was an unreasonable one. Where the medical witnesses, who are of course the best qualified to determine such a matter, disagree as to the danger and necessity of the examination, we think the final decision must be left, with other decisions on questions of fact, to the commission. It is true that in some cases this may work an injustice to a claimant, but a contrary rule would, in our opinion, produce far greater injustice.

Since the petitioner declined to submit himself to the examinations requested by the commission, and since we cannot say, as a matter of law, that these examinations were so arbitrary and unreasonable as to be beyond the jurisdiction of the commission to make, and since in their absence we cannot say petitioner's present condition is shown affirmatively to be the result of his injuries, the award is affirmed.

McALISTER, C. J., and ROSS, J., concur.