459 P.2d 732

**Harry GOLDBAUM, Appellant,**

v.

**BLOOMFIELD BUILDING INDUSTRIES, INC., a Delaware corporation, and Southern Builders, Inc. of Tennessee, a Tennessee corporation, Appellees.**

**No. I CA–CIV 749.**

Court of Appeals of Arizona,

Division 1.

Department B.

Oct. 16, 1969.

---

Kaplan, Wilks & Abrams, by Philip M. Haggerty, Phoenix, for appellant.

Jennings, Strouss, Salmon & Trask, by Nicholas Udall, Thomas C. Kleinschmidt, Phoenix, for appellees.

EUBANK, Presiding Judge.

Harry Goldbaum, hereinafter referred to as plaintiff, appeals from the judgment of the Maricopa County Superior Court, sitting without a jury, in favor of Bloom-field Building Industries, Inc., and Southern Builders, Inc. of Tennessee, hereinafter referred to as B.B.I. and S.B.I., respectively, decreeing that plaintiff Goldbaum take nothing by his complaint, which alleged a cause of action for an accounting arising out of an alleged express oral contract between the parties.

Plaintiff raises four questions for review, of which Number II, concerning the alleged contract, is of primary importance to the disposition of this appeal. Appellee states the same question in more manageable terms than does appellant:

"Was the alleged agreement so vague, indefinite, uncertain and lacking in particularity that it could not be interpreted or given effect as an enforceable contract against either appellee?"

Plaintiff is in effect requesting that we review the factual issue of whether or not the alleged contract was sufficiently proven by him to support his accounting action against S.B.I. In this context we will do so.

In 1960 plaintiff, a realtor, was employed by S.B.I. to render services in connection with the operation of Central Towers located in Phoenix, Arizona. He was paid $150 per week and it was agreed that he would receive a "ten per cent participation" in any deal presented to and accepted by S.B.I. B.B.I., of which S.B.I. became a subsidiary, was formed in 1961 and acquired through another subsidiary, which is not a party to this action, title to a combination Greyhound Bus Terminal office building located in Milwaukee, Wisconsin. The plaintiff had contacted officials of Greyhound concerning the acquisition of the land and the construction of this building in the summer of 1962, and it is upon this basis that appellant filed his action in the lower court asking for an accounting of his "10% participation." In December 1962, the appellant was discharged by S.B.I.

Following the trial, the court made its findings of fact and conclusions of law.

Those findings necessary to the disposition of the contract question are as follows:

"The Court finds as follows:

"1. That Plaintiff was employed by Southern Builders of Tennessee, a Corporation, on June 20, 1960, in the State of Tennessee, the agreement providing that Plaintiff was to render services for Southern Builders of Tennessee, Inc., in Phoenix, Arizona, in connection with the operation of Central Towers Building, which building was situated in the City of Phoenix, Arizona, that Plaintiff would receive a salary for this service. The agreement further provided that the Plaintiff would receive ten percent participation in any deal presented to and accepted by Southern Builders of Tennessee, Inc.

\* \* \* \* \* \*

"5. During visits to Phoenix, Arizona, H. Bloomfield, the President of Bloomfield Building Industries, Inc., who was also the President of Southern Builders of Tennessee, Inc., investigated several business deals proposed by Plaintiff. No Arizona business proposals made by Plaintiff were acceptable nor consumated. [sic]

\* \* \* \* \* \*

"9. The Southern Builders, of Tennessee, Inc., during times mentioned did carry on business transactions within the State of Arizona in a substantial manner and is subject to the jurisdiction of this Court.

\* \* \* \* \* \*

"11. That the alleged contract of participation relied upon by Plaintiff is vague, indefinite, uncertain, and unenforceable for the reason that specific detail as to the functioning of the contract, or the liability thereunder, or the method of delineating interest, or the method of computation of interest was never agreed upon. \* \* \*"

\* \* \* \* \* \*

CONCLUSIONS OF LAW

\* \* \* \* \* \*

"This Court does have jurisdiction over Southern Builders, Inc. of Tennessee.

"That the agreement between Plaintiff and Southern Builders of Tennessee is vague, indefinite, and unenforceable."

\* \* \* \* \* \*

Plaintiff-Goldbaum, in his opening brief, clearly recognizes his problem of proof in this case by these words:

"The trial court in its findings of fact found that the 'participation' agreement was unenforceable as vague, indefinite and uncertain. *Counsel for the Plaintiff appellant cheerfully admits that, at the inception of this action, we had no idea what a 10% participation interest meant.* We believe the transcript makes it quite clear that counsel for the appellee had very little idea, and we are sure that the honorable court had never run across such an agreement before in his experience on the bench. But the essential fact is that this type of contract has a clear, definite and certain meaning within the trade. The parties to the contract understood what it was, and they all testified as to what it would be. \* \*" (Emphasis added).

If, as Plaintiff-Goldbaum states, he met the burden of proving his oral contract and the terms were clear, definite and certain, and if there was no evidence to support the trial court's findings, then this court would be required to grant his prayer to reverse the judgment of the trial court. We do not, however, see the evidence in the same light that the appellant does.

First, the written documents in evidence, which were introduced as memoranda in support of the oral contract, demonstrate a clear conflict in the understanding of each party to the oral contract. Plaintiff's Sept. 16, 1960, letter to S.B.I. expresses a twenty per cent participation and demands

a written contract.[1] President Bloomfield of the S.B.I. replied three days later, on September 19, 1960, rejecting plaintiff's understanding in a rather forceful letter, excerpts of which are as follows:

\* \* \* \* \* \*

"In reply to your many letters of September 14th through the 16th, and particularly your letter of September 16th, perhaps I did not make myself clear on the many occasions in which we discussed your connection with Southern Builders, Inc., so I am going to put into this letter the exact agreement that will be followed in any connection which you have with this company.

"You went to work for Southern Builders, Inc. at a salary of $150.00 per week, plus miscellaneous expenses in direct connection with your work for this company, with the understanding that *you would get a part of any deal which you brought in to me, this proportion to be determined on the basis of each deal.*

"I further agreed that upon Southern Builders getting work in the area which could be attributed to your efforts, *we would increase your salary to an amount to be determined by me.* It appears that you regard yourself as an associate of Southern Builders, or myself; this is not the case, since you definitely are an employee of the company and are supposed to spend 100% of your time working for Southern Builders, Inc.

\* \* \* \* \* \*

"I hope you understand that the only way you can be connected with this firm is to be a fulltime employee of Southern Builders. *If this arrangement does not meet with your approval, please let me know and we will have to terminate our arrangement.*

\* \* \* \* \* \*

"I hope I have made myself clearly understood as far as your position with this company is concerned, and until further action is taken to make you an officer you have no authority to bind Southern Builders to any agreements. If you prove yourself as adept in working things through to a conclusion as you have in finding prospects, when the proper time comes you will be made an officer in the corporation." [2] (Emphasis added.)

\* \* \* \* \* \*

On Dec. 6th, 1960, plaintiff wrote S.B.I. a letter containing a projection of a "deal" in it. This letter was not placed into evidence. The Dec. 7, 1960, reply by Mr. Bloomfield addressed to appellant was introduced and contained this statement:

\* \* \* \* \* \*

"Regarding the Phoenix building, you would get no part of any commission but only a 10% participation as per our agreement. If this is not satisfactory you had better quit working for us immediately. I would like to be advised in writing as to your agreement to this, for now and all future deals we have." [3]

---

[1]. Plaintiff's Sept. 16, 1960, letter to S.B.I. showing his "impression" of a 20% participation understanding.

\* \* \* \* \*

"The promotions of any of these deals take a great deal of time and energy, which I am only too happy to provide, but at the same time I must know just how I stand.

"*I was under the impression* that I would, on a deal \* \* \* where I could get a 50% equity for Southern Builders I would wind up with 10% of the entire deal and Southern would get the net of 40% = plus a fair share of construction profits. (Emphasis added).

\* \* \* \* \*

"With all of this in mind, I would sincerely appreciate a written agreement that would be mutually beneficial.

"I honestly feel that a written agreement would put our minds at ease and help the deals pending fall in place."

[2]. There was no response to this agreement to agree in the future by the appellant and he apparently accepted the S.B.I. understanding of the agreement for the time being.

[3]. There was no agreement introduced into evidence.

* * * * * *

Certainly the written evidence cannot be cited as contributing to the clarity of understanding between the parties as plaintiff contends.

Next, the testimony of the parties as to what constituted a "ten per cent participation" is in conflict.

The plaintiff testified that his agreement was to receive $150.00 per week from S.B.I. and, " * * * a participation of ten per cent in any deal that you (Plaintiff) bring about, that we [S.B.I.] accept." He then defined "participation" as, "an individed [sic] interest supported by a deed. That in essence is it." On cross-examination plaintiff demonstrated that he had no understanding of the terms of his alleged contract when he testified, to a hypothetical ten million dollar "deal" in terms where he would be entitled to take all of the S.B.I. or B.B.I. financial investment in a "deal."[4] Later in the trial, the plaintiff's confusion was clearly documented as follows:

"Q. When you talk about ten per cent of a deal you generate, I'd like to find out what you mean by a deal. Mr. Goldbaum, I am showing here on the board a big square representing the whole, and this is the deal you generated, and if we encumber 90 per cent of it with a mortgage to pay for the contractor and the land and all, you would have an interest in this 90, would you?

"A. [Plaintiff] That would be for the Court to decide sir, I couldn't possibly.

"Q. No—

"A. I couldn't make a determination of that type.

"Q. * * * you don't know what your agreement was, what was your agreement?

"A. My agreement was a ten per cent participation.

"Q. All right, did that ten per cent include an obligation on your part to assume ten per cent of the 90 per cent encumbrance?

"A. No.

"Q. Okay, then, your [sic] confined here is [sic] to this little ten per cent equity Mr. Bloomfield will have, right?

"A. This again would be a matter for the Court to decide. It certainly isn't for me.

"Q. Well, you don't know what your deal was, then?

"A. I couldn't presume to be an expert in this type of law.

"Q. Well, what was your understanding of what you were going to get?

"A. My understanding was a ten per cent participation, and as I see participation merely means an equity, an undivided equity supported by a deed and this is the only possible way that it could be.

"Q. Well, yesterday you testified along those lines, that you would be entitled to a ten per cent interest, supported by a deed? Now, if the facts are that an entity subject to the jurisdiction of this Court has a deed to this property, you expect that entity to be required by the Judge to give you a deed to an undivided one-tenth, or ten per cent, is that right?

"A. That is correct.

"Q. And is [it] to be free or subject to a 90 per cent encumbrance?

"A. That would be free.

"Q. So this would be free?

"A. That is right.

4. "Q. So that if Mr. Bloomfield (S.B.I.) did have $1,000,000 equity in the building (with a $9,000,000 mortgage lien against it), as soon as you presented this project and he accepted it, he was obli-
gated to give you a deed or agreed to a conveyance of a one-tenth interest, is that correct?"
"A. (Plaintiff) That is right."

"Q. So [if] Mr. Bloomfield, if he has a ten per cent equity in this, and you are entitled to ten per cent free and clear, you wiped him [Bloomfield] out, didn't [sic] you?

"A. No.

"Q. Under this hypothetical, what else could you do, sir?

"A. Perhaps I didn't get—maybe I don't see it just as you are trying to explain it, sir."

\*   \*   \*   \*   \*   \*

At several other points in his testimony, plaintiff testified that his "ten per cent participation" was in the "whole" or gross investment, not merely the equity owned by S.B.I. or B.B.I.

Marvin Jacobs, a real estate broker, appraiser and former employee of S.B.I. and B.B.I. testified. It is upon his testimony that plaintiff bases his statement in his question for review that the terms of the agreement had a special meaning, "within the industry, business or trade involved," which made a "ten per cent participation" definite and clear in meaning.

In his brief, plaintiff fails to point out where Mr. Jacobs testified to such a broad understanding. In fact, a fair reading of his testimony is opposed to the testimony of the plaintiff that he was to share in ten per cent of the "whole" deal.[5]

Finally, Mr. Harry Bloomfield, president of S.B.I. and B.B.I. testified as the last witness. He testified that he had no other agreement with plaintiff than the $150.00 per week salary and expenses, but that he did tell plaintiff that he could have a participation in this manner:

\*   \*   \*   \*   \*   \*

"I made it very clear to him that each participation would be on the basis of that particular project, would be determined by me and that we would reach an agreement before we went into a deal as to his participation, that he was told he would be a partnership, a partner in the deal by having a part ownership in a corporation to be created, and he would be given stock in this corporation, and he would participate in that particular corporation, and he would have to sign his name to all of the documents, so that he would become, in effect, a full partner in that deal." [6]

There was no evidence introduced at the trial that any agreement was entered into concerning the Greyhound Bus Terminal deal.

Plaintiff alleged in his complaint the existence of an express oral contract with S.B.I. which contained very definite terms. He had the burden of proving this contract by a preponderance of the evidence. This required burden is really the burden of persuading the trier of fact that the terms of the express oral contract were mutually understood and agreed to between plaintiff and S.B.I. by evidence which is more probable to the existence of such contract terms than to the nonexistence of such terms. Cole v. Town of Miami, 52 Ariz. 488, 83 P.2d 997 (1938); Ison v. Western Vegetable Distributors, 48 Ariz. 104, 59 P.2d 649 (1936); C. T. McCormick, Law of Evidence, Sec. 319, at 677 (Ed.1954); Udall, Arizona L. Evidence, Sec. 5, (Ed. 1960). The reason that he failed to persuade the trier of fact in this case is obvious from the foregoing review of the evidence in this case.

---

5. When asked whether in his experience he had ever heard of an agreement where a person who found a deal would participate as set out in plaintiff's Sept. 16, 1960, letter, he said, "Not in a ten per cent ownership of a property, that would not be subject to all of the total indebtedness whether it be mortgaged or a loan or various other monies that is put into the property, so that you owned a ten per cent interest in the property, you would own your interest in the debt and the obligations and also in the losses. \* \* \*" He later testified that a participation was usually in the equity interest and not in the "whole" investment.

6. This is in accord with his September 19th, 1960, letter, and December 7, 1960, letter, excerpts of which are set out heretofore.

458

A good statement of the law is contained in the Restatement of the Law of Contracts, Sec. 32 (1932), which states that:

"An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain."

Comment:

"a. Inasmuch as the law of contracts deals only with duties defined by the expressions of the parties, the rule stated in the Section is one of necessity as well as of law. The law cannot subject a person to a contractual duty or give another a contractual right unless the character thereof is fixed by the agreement of the parties. A statement by A that he will pay B what A chooses is no promise. A promise by A to give B employment is not wholly illusory, but if neither the character of the employment nor the compensation therefor is stated, the promise is so indefinite that the law cannot enforce it, even if consideration is given for it."

\* \* \* \* \* \*

Illustrations:

\* \* \* \* \* \*

"6. A promises B to sell to him and B promises A to buy of him goods 'at cost plus a nice profit.' The promise is too indefinite to form a contract."

\* \* \* \* \* \*

"10. A promises B to do a specified piece of work and B promises A to pay a price to be thereafter mutually agreed. As the only method of settling the price is dependent on future agreement of the parties, and as either party may refuse to agree, there is no contract."

\* \* \* \* \* \*

See Gray v. Aiken, 205 Ga. 649, 54 S.E. 2d 587 (1949) which involves a very similar fact situation.

See also cases cited in 1 Corbin on Contracts, Sec. 97 at page 425 (1963); Williston on Contracts, 3rd Ed. Sec. 105A; Anno. 18 A.L.R.2d 206 (1951).

The rules for the review of factual determinations by the trial court are clearly delineated by the Arizona Supreme Court in Tri-State Insurance Company v. Maxwell, 104 Ariz. 574, 457 P.2d 251, 254 (1969) as follows:

"In the ruling on this assignment of error we have a clear line of cases in Arizona that establish the following rules of law: (1). Where the evidence is in conflict, the Supreme Court will not substitute its opinion for that of the trial court. (2). Evidence will be taken in the strongest manner in favor of support of the judgment of the trial court. (3). A judgment will not be disturbed when there is any reasonable evidence to support it. Anderson v. Artesia Investment Co., 66 Ariz. 335, 188 P.2d 455; Sturges v. Tongeland, 83 Ariz. 148, 317 P.2d 941, 942; Eldridge v. Jagger, 83 Ariz. 150, 317 P.2d 942; Daru v. Martin, 89 Ariz. 373, 363 P.2d 61."

In our review of the facts, heretofore, we find that there is conflict in the evidence as to what the parties thought a "ten per cent participation agreement" consisted of, and that there is reasonable evidence in the record to support the trial court's findings that the alleged contract of participation was vague, indefinite, uncertain and therefore unenforceable.

It is not necessary to consider the other three questions on appeal for the reason that they are all based upon there being an enforceable contract between the parties.

The judgment of the trial court is affirmed.

HAIRE and JACOBSON, JJ., concur.